JUL. 22. 2013   2:15PM    CLAIMS MGRS                                  NO. 404   P. 4/24

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

JUL 15 2013

TIM RHODES
COURT CLERK

| RODNEY RAMSEY and LORI RAMSEY, | 30_____ |
| Plaintiffs, | |
| v. | Case No: |
| STATE FARM FIRE AND CASUALTY COMPANY, | CJ-2013-3961 |
| Defendant. | JURY TRIAL DEMANDED |

### PETITION

#### COUNT I.

1. Plaintiffs, Rodney and Lori Ramsey, own a home in Oklahoma City, Oklahoma County, Oklahoma which was insured by Defendant, State Farm Fire and Casualty Company.

2. On or about May 16, 2010, Plaintiffs' home was damaged in a catastrophic wind and hail storm while insured by State Farm.

3. Plaintiffs gave proper and timely notice and proof of loss of this claim to Defendant, through its representatives, and otherwise complied with all conditions precedent for recovery under the subject insurance policy.

4. Defendant acknowledged coverage for this storm damage loss and made certain payments on May 25, 2010 and August 17, 2012 for some of the covered storm damage.

5. In its handling of Plaintiffs' claim, Defendant breached the insurance contract and the implied covenant of good faith and fair dealing, as a matter of standard business practice, in the following respects:

    a. failing and refusing payment and other policy benefits on behalf of Plaintiffs at a time when Defendant knew that it was entitled to those benefits;

    b. failing to properly investigate Plaintiffs' claims and to obtain additional



JUL. 22. 2013  2:15PM    CLAIMS MGRS                                NO. 404   P. 5/24

information both in connection with the original refusal and following the receipt of additional information;

c. withholding payment of the benefits on behalf of Plaintiffs knowing that Plaintiffs' claims for those benefits were valid;

d. refusing to honor Plaintiffs' claims in some instances for reasons contrary to the express provisions of the policy and/or Oklahoma law;

e. refusing to honor Plaintiffs' claims in some instances by applying restrictions not contained in the policy;

f. refusing to honor Plaintiffs' claims in some instances by knowingly misconstruing and misapplying provisions of the policy;

g. failing to adopt and implement reasonable standards for the prompt investigation and reasonable handling of claims arising under these policies, to include Plaintiffs' claims;

h. not attempting in good faith to effectuate a prompt, fair and equitable settlement of Plaintiffs' claims once liability had become reasonably clear;

i. forcing Plaintiffs, pursuant to its standard claims practice, to retain counsel in order to secure benefits Defendant knew were payable;

j. failing to properly evaluate any investigation that was performed;

k. improperly shifting the burden and expense of investigation to Plaintiffs;

l. intentionally delaying investigation;

m. refusing to communicate with Plaintiffs or their representative about the status of the claim;

n. affirmatively misleading and deceiving Plaintiffs into believing that their policy benefits would be paid;

o. tendering an unreasonably low amount as settlement for Plaintiffs' claim;

all in violation of the contract and the implied covenant of good faith and fair dealing and resulting in financial benefit to the Defendant.

2

6. As a direct and proximate result of the Defendant's breach of contract breach of and the implied covenant of good faith and fair dealing, Plaintiffs have suffered loss of policy benefits, embarrassment, anxiety, frustration and mental and emotional distress.

7. Defendant has acted intentionally and with malice or has been guilty of reckless disregard for the rights of Plaintiffs and others entitling Plaintiffs to punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000.00 for compensatory damages and in an amount in excess of $75,000.00 in punitive damages plus interest, costs, attorney fees and all other relief which the Court deems just and equitable.

### COUNT II.

8. State Farm's promotes an image of itself as being "like a good neighbor" in order to sell insurance. This advertising is done to convince prospective insureds that it will will not place its financial interests ahead of the interests of its insureds, engage in sharp practices, lie, deceive or ignore its insured's claims, and will take a proactive role in the claim process to make sure that the insured is properly and fully indemnified for their covered claims.

9. Plaintiffs relied on this advertising campaign in the selection of State Farm as their insurance company for their home.

10. In the subject claim, State Farm acknowledged coverage, and paid policy benefits for some but not all of the covered damage. These actions by State Farm further assured Plaintiffs, in addition to State Farm's advertising campaign that State Farm was going to promptly and fairly handle their claim and indemnify them for the necessary repair costs caused by the catastrophic wind and hail storm.

JUL. 22. 2013  2:16PM    CLAIMS MGRS                                    NO. 404    P. 7/24

11. State Farm's routine claim practice is to provide the insured with a written "Structural Damage Claim Policy" form letter. State Farm provides this form letter to insureds for the purpose of causing them to rely on the information contained therein and follow the instructions. This form letter states in part:

- We want you to receive quality repair work to restore the damages to your property.

12. This statement along with State Farm's advertising that it acts "like a good neighbor" and actions in acknowledging coverage and making at least partial payment for the covered damage in a prompt fashion was additional assurance to Plaintiffs that State Farm was going to cover the claim and pay the necessary repair cost to indemnify Plaintiffs for the storm damage.

13. The form letter further instructed the insured as follows:

- "We will provide you with a detailed estimate of the scope of the damage and costs of repairs. Should the contractor you select have questions concerning our estimate, they should contact your claim representative directly."

Plaintiffs' contractor, Darrell Habben, did have a question concerning State Farm's scope of repairs because the State Farm adjuster had inexplicably missed obvious storm damage to the rear and side elevations of Plaintiffs' house.

14. Mr. Habben, on behalf of Plaintiffs, requested on numerous occasions that State Farm send out the adjuster for a reinspection to confirm the additional damage. This process was complicated by the fact that State Farm's claims procedure is apparently to shift claims around to different adjusters which of course requires the insured or in this case the insured's contractor to have to explain the problem or issue each time to a new adjuster.

4

15.     Mr. Habben replaced the roof and was in the process of repairing the windows and siding when an Oklahoma City building inspector required Mr. Habben to stop work until the exterior of the house could be tested for the presence of lead paint.

16.     Mr. Habben located and paid a company to do lead paint testing. This confirmed the presence of lead paint which requires an expensive abatement procedure to remove the lead paint. Plaintiffs therefore incurred this expense because Mr. Habben is going to be paid by Plaintiffs for his services.

17.     Additionally, in the process of attempting to complete the repairs, Mr. Habben became aware that because more than 60% of the siding of Plaintiffs home would have to be replaced, Oklahoma City Historical Preservation District regulations required the exterior to be put back in its original construction. Mr. Habben prepared a revised repair estimate taking into account the extra expense for lead paint abatement and compliance with Historical Preservation District regulations which essentially required the removal of all the steel siding and windows on Plaintiffs' home and replacement with historically accurate replacement wood siding and windows.

18.     The structural damage claim policy letter also advises the insured:

- "There may be building codes, ordinances, laws, or regulations that affect the repairs of your property. These items may or may not be covered by your policy. Please contact your claim representative if you have any questions regarding coverage which may be available under your policy."

- "If you select a contractor whose estimate is the same as or lower than our estimate, based on the same scope of damages. We will pay based upon their estimate. If your contractor's estimate is higher than ours, you should contact your claim representative prior to beginning repairs."

5

19.  In compliance with State Farm's instructions, Mr. Habben provided State Farm with repair estimate for the increased cost of repairs due to the above law, ordinances and regulations and discussed with the State Farm adjusters (again, a different one each time he called) that the lead paint would have to be abated and that the Historical Preservation District Regulations would have to be complied with because more than 60% of the exterior of the home had been damaged and would be replaced.

20.  State Farm's adjusters never advised Mr. Habben that these increased costs for lead abatement and historical preservation district requirements were not covered. The only issue appeared to be whether 60% or more of the exterior needed to be replaced. In their phone discussions, State Farms' representatives led Plaintiffs to believe that if the requisite amount of exterior had to be replaced, than the ordinance or law coverage for increased construction costs would be available for Plaintiffs.

21.  Mr. Habben repeatedly requested that State Farm send another adjuster out to confirm what he had been telling them, that storm damage had been missed on the rear and one of the sides of the structure. State Farm's adjusters promised on two different occasions to come and inspect the property but on both occasions called on the day of the inspection to cancel. On or about August 17, 2012 Mr. Habben was finally able to get a State Farm adjuster to come reinspect the property and he found that, just like Mr. Habben had been telling State Farm, there was additional exterior damage which had been omitted by the first adjuster. State Farm made an additional payment for these repairs in August 2012.

22.  Mr. Habben again followed up and contacted State Farm regarding increased costs due to ordinance and regulations because State Farm had now confirmed that there was, in

fact, more than 60% of the house exterior that needed to be replaced. State Farm responded with a letter advising that the increased costs for ordinance or law could not be recovered because the repairs were not completed within two years from the date of loss. State Farm intentionally delayed reinspecting the loss until after the two year period so that it could deny coverage based on the delay that its own adjusters caused.

23. Plaintiffs through their representative, Darrell Habben, followed the instructions he was given by State Farm. There was a question on building codes, ordinances or laws. And, Mr. Habben's estimate was much higher than State Farm's because of the increased cost of repairs due to the lead paint and historical preservation district requirements. State Farm required approval for these extra costs so Plaintiffs, through Mr. Habben, followed the requirements dictated by State Farm to get this approved.

24. The State Farm representatives, during their various and many conversations with Darrell Habben did not tell him that there was no coverage for increased cost due to building codes, ordinances, laws, or regulations. The State Farm representatives further did not tell Mr. Habben that they would not reinspect or reconsider the claim. Instead, they promised to reinspect, set appointments, and then cancelled. The State Farm representatives never told nor even hinted to Mr. Habben or Plaintiffs prior to the October 4, 2012 letter that State Farm was going to require the repairs to be completed in two years.

25. The State Farm knew or should have known under the above circumstances that Plaintiffs believed that State Farm was going to cover the damage and the increased cost of repairs as soon as the State Farm reinspected the house.

26. State Farm specifically instructed Plaintiffs not to commence repairs outside the scope that State Farm authorized. Then State Farm deceived Plaintiffs into believing that as soon

as the house could be reinspected to confirm the additional damage, that approval for the increased costs due to ordinance or laws could be obtained. State Farm deceived and misled Plaintiffs into believing they would be treated fairly and then took advantage of Plaintiffs.

27.  Plaintiffs relied upon the above representations and actions of State Farm and were misled by State Farm's concealment of the fact that it intended to look for a way to avoid paying policy benefits.

28.  Plaintiffs suffered mental and emotional distress and financial loss including loss of policy benefits as a direct result of the above described fraud, constructive fraud, concealment, false representation and deceit.

29.  Defendant's actions were willful and malicious or wanton and reckless and Plaintiffs are entitled to recover punitive damages.

30.  The numerous conversations involving false representation and concealment took place between Darrell Habben (Plaintiff's construction contractor) and various State Farm claims personnel from May 2010 through September 2012. The individuals that Mr. Habben discussed these issues with included the following: Nayla (last name unknown) at 866-249-4676; Ted (last name unknown) at 877-783-1200; Team #54 at 866-601-0210; Janice at 800-624-4513; India Gamboa at 816-246-8456 and David Pickard. There may be additional people Plaintiffs contractor talked to but this is as specific as we can get at this point. Plaintiffs have pled as much detail as they can at this stage of the proceedings.

WHEREFORE, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000.00 for compensatory damages and in an amount in excess of $75,000.00 in punitive damages plus interest, costs, attorney fees and all other relief which the Court deems just and equitable.

JUL. 22. 2013   2:19PM    CLAIMS MGRS                                    NO. 404    P. 12/24

_____
Steven S. Mansell, OBA #10584
Mark A. Engel, OBA #10796
Kenneth G. Cole, OBA #11792
MANSELL ENGEL & COLE
101 Park Avenue, Suite 665
Oklahoma City, OK 73102-7203
T: (405) 232-4100  F: (405) 232-4140
Email: mansell-engel@coxinet.net

ATTORNEYS FOR PLAINTIFF

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**

9